**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* SHARON JOYCE, | ) ) ) | C.A. No. 2:20-cv-01223-DCN |
| Plaintiffs, | ) ) | |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| GLOBAL OFFICE FURNITURE, LLC, and MALCOLM E. SMITH, | ) ) ) | |
| Defendants. | ) ) ) | |

**COMPLAINT IN INTERVENTION**

The United States of America, by and through the United States Attorney, files this Complaint in Intervention alleging as follows:

## I.    INTRODUCTION

1.    Having filed a Notice of Election to Intervene pursuant to 31 U.S.C. § 3730(b)(4)(A), the United States brings this action under the False Claims Act ("FCA"), 31 U.S.C. § 3729–3733, seeking damages and civil penalties from Global Office Furniture, LLC ("GOF") and its owner, Malcom E. Smith (collectively, "Defendants"). Alternatively, this action seeks to recover damages under the common law theory of unjust enrichment.

2.    Starting around May 2019, Defendants engaged in a scheme to fraudulently avoid customs duties owed to the United States on office chairs imported from the People's Republic of China ("the PRC").

3.    Specifically, Defendants, acting in concert with a Chinese manufacturer, knowingly submitted, or caused the submission of, false and fraudulent invoices and entry documents to U.S. Customs and Border Protection ("CBP"), a component of the U.S. Department of Homeland

1

Security, that deliberately and materially understated the value of their imported merchandise. Because customs duties are based on the transaction value of the merchandise, fraudulently undervaluing these imports led to fraudulently lowered calculations of customs duties owed.

4.    As a result of these actions, Defendants fraudulently avoided paying millions of dollars in customs duties on merchandise imported into the United States between July 2019 and September 2023 ("the relevant time period").

## II.    **JURISDICTION AND VENUE**

5.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1367(a).

6.    This Court may exercise personal jurisdiction over Defendants under 31 U.S.C. § 3732(a) because each Defendant resided and transacted business in the District of South Carolina during the relevant time period.

7.    Venue is proper in the District of South Carolina under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b), because Defendants transact or transacted business in this district, and a substantial part of the events giving rise to this action occurred in the District of South Carolina.

8.    As the United States is intervening in a *qui tam* action, which relator Sharon Joyce filed on March 30, 2020, this complaint relates back to the filing date of the complaint of the person who originally brought this action and is timely under the FCA's statute of limitations. *See* 31 U.S.C. §§ 3731(b), (c).

## III.    **THE PARTIES**

9.    Plaintiff United States of America brings this action on behalf of CBP, which regulates the importation of merchandise into the United States, including the collection of duties and tariffs owed.

10.    Defendant GOF is a limited liability company that sells office furniture. GOF has a principal place of business at 4108 Carolina Commercial Drive, Suite 4, Myrtle Beach, South Carolina 29579.

11.    Defendant Malcom E. Smith is a resident of South Carolina. During the relevant time period, he owned and operated GOF. Smith is the President of GOF and was active in, and knowledgeable of, the management, operations, and sales decisions and activities of GOF.

12.    Relator Sharon Joyce was employed by GOF from January 2017 to December 2019. Joyce started at GOF as an account executive and rose to the position of Vice President of Operations before leaving the company.

## IV.    THE FALSE CLAIMS ACT

13.    The False Claims Act is the primary civil statute the federal government uses to combat fraud upon the United States.

14.    The FCA establishes liability for a defendant that "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). This is known as the "reverse false claims" provision of the FCA.

15.    The term "knowingly" in the FCA context means that a defendant (i) has actual knowledge of the information, (ii) acts in deliberate ignorance of the truth or falsity of the information, or (iii) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1). No proof of specific intent to defraud is required to show that a person acted knowingly under the FCA. *Id.*

16.     The term "material" in the FCA context means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

17.     If a defendant is found liable under the FCA, they are liable for three times the amount the damages the government has sustained as a result of the defendant's action, plus a civil penalty per violation. 31 U.S.C. § 3729(a)(1); 28 C.F.R. Part 85.5.

18.     A defendant can be liable even when another entity makes the actual submission of the false claim to the United States or makes or uses the false record or statement. *Tanner v. United States*, 483 U.S. 107, 129 (1987) ("the fact that a false claim passes through the hands of a third party on its way from the claimant to the United States does not release the claimant from culpability under the Act"). This principle applies in the customs duty context. *See United States ex rel Taylor v. GMI USA Corp.*, 714 F. Supp. 3d 275, 289 (S.D.N.Y. 2024) ("The False Claims Act imposes liability on a person who 'knowingly makes, uses, or causes' a false record or statement 'to be made or used.'" (citing 31 U.S.C. § 3729(a)(1)(G))).

### V.     CUSTOMS DUTIES, LAW, AND PROCESS

19.     All merchandise imported into the United States is required to be "entered" unless specifically excepted. 19 C.F.R. § 141.4(a); 19 U.S.C. § 1484. Merchandise is entered when, among other things, an importer or its agent (usually a licensed customs broker acting on behalf of the importer) files appropriate documents or data with CBP that allow the agency to assess the customs duties due on the merchandise being imported into the United States. 19 C.F.R. § 141.0a(a).

20.     The documents required to be filed with CBP to complete entry include, among other things, a CBP Form 7501 (the "entry summary"). An entry summary may be filed in

hardcopy or electronically using CBP's Automated Commercial Environment ("ACE") system. The electronic entry summary contains the same information as the CBP Form 7501. *See* 19 U.S.C. § 1484; 19 C.F.R. Part 143.

21.     The entry summary must contain, among other things, the date of import, the importer of record, a code signifying the entry type, and the value of the imported merchandise. Additionally, the entry summary must contain the appropriate Harmonized Tariff Schedule of the United States ("HTSUS Code"), a 10-digit code based on the materials, intended use, and method of creation of the merchandise imported. The HTSUS Code also determines the general customs duties rate to be assessed on each imported item.

22.     The importer of record is responsible for accurately classifying merchandise imported into the United States by assigning proper HTSUS codes to the merchandise and ensuring that the importer's customs brokers record those codes on entry summaries. *See* 19 U.S.C. § 1484.

23.     Importers are required to maintain, and submit upon request, documentation supporting statements made and information provided on the entry summary. Supporting documentation includes a commercial invoice verifying the value of merchandise being imported, a packing list, and a bill of lading. These documents must be maintained for a period of five years after the date of entry. *See, e.g.*, 19. U.S.C. § 1508; 19 C.F.R. 163.4; 19 C.F.R. Pt. 163, App.

24.     Pursuant to 19 U.S.C. § 1484, an "importer of record" is responsible for paying the customs duty and using reasonable care in making and providing accurate documentation to CBP so that CBP may properly assess duties on imported merchandise. 19 U.S.C. § 1484(a)(1)(B).

25.     The value of the merchandise being imported determines the amount of duties owed to the United States. 19 U.S.C. § 1401a; 19 C.F.R. § 152.101. In most cases, the amount of customs duty owed is equal to the imported merchandise multiplied by the applicable duty rate.

26.     Generally, importers of record are required to declare the "transaction value" of the merchandise, which is the price actually paid or payable for the imported merchandise plus, if applicable, certain additional costs incurred with respect to the merchandise. 19 U.S.C. § 1401a(a)(1)(A), (b).

27.     The importer of record may provide information and pay customs duties either personally or through an agent assigned in writing. An assigned agent may include a customs broker or a consignee. Use of an assigned agent does not relieve the importer of record of its responsibilities. *See*, *e.g*., 19 C.F.R. § 141.1(b).

28.     The entry summary includes a declaration that "the statements in the documents herein filed fully disclose to the best of my knowledge and belief the true prices, values, quantities . . . are true and correct," and "that all goods or services provided to the seller of the merchandise either free or at reduced cost are fully disclosed." CBP Form 7501; 19 C.F.R. §141.61.

29.     The declarant also declares that they will "immediately furnish to the appropriate CBP officer any information showing a different statement of facts." *Id.*

30.     An importer of record must also file a declaration that "statements in the invoice or other documents filed with the entry, or in the entry itself, are true and correct." 19 U.S.C. § 1485(a)(3).

31.     Defendants knowingly avoided or decreased their obligation to pay the correct amount of customs duties to CBP for merchandise imported from the PRC by knowingly making or using, or causing others to make or use, entry summaries and supporting documents filed with CBP that contained false representations and certifications about the value of the imported merchandise.

## VI.     **DEFENDANTS' FRAUDULENT SCHEME TO EVADE CUSTOMS DUTIES**

### A. **Defendants' Business**

32.     Prior to incorporating GOF, Smith worked for Global Furniture (Zhejiang) Co., Ltd. ("Global Furniture") as a sales representative based in the United States. Global Furniture manufactures office chairs in the PRC.

33.     In 2013, Smith incorporated GOF as a limited liability company in the state of South Carolina. GOF was created to sell office chairs from Global Furniture. GOF sold the imported chairs on Amazon under the Amazon Basics brand name.

34.     Global Furniture continued to employ Smith as an Executive Vice President of Sales for North America after Smith founded GOF.

35.     GOF first imported merchandise from Global Furniture in 2017. During the relevant time period, the only merchandise GOF imported from Global Furniture were office chairs and related parts manufactured in the PRC.

36.     The usual import process began when a customer ordered merchandise from GOF. GOF employees would then create a purchase order for Global Furniture that would be sent to Smith for approval. Smith was the primary GOF point of contact with Global Furniture, and he did not allow GOF employees to send purchase orders to Global Furniture without his approval.

37.     GOF purchase orders were sent to Global Furniture, often by Smith himself. Smith did not allow GOF employees to contact Global Furniture on their own. Employees either had to send purchase orders through Smith or get Smith's approval before contacting Global Furniture directly.

38.     Global Furniture would create a pro forma invoice in response to GOF's purchase order. The pro forma invoice reflected the agreement between Global Furniture and GOF regarding

the quantity, type, and price of office chairs purchased by GOF. Global Furniture would send the pro forma invoice back to GOF, and Smith would review and approve it. Sometimes the price or quantity listed on the pro forma invoice would differ slightly from the price or quantity listed in the purchase order, and Smith would work with Global Furniture to clarify and finalize the pro forma invoice before signing it.

39.     GOF and Global Furniture agreed that the office chairs would be imported Free on Board ("FOB"), according to industry established "Incoterms" governing terms of shipment. This meant that Global Furniture was responsible for clearing the merchandise through export customs and delivering it to the importing vessel. Global Furniture would create a commercial invoice reflecting the final purchase agreement, which included the quantity and price of the purchased office chairs, as well as other shipping documents like packing lists. Global Furniture provided these documents to GOF and the company selected to coordinate shipping logistics, referred to as a freight forwarder. Commercial Incoterms dictate that Global Furniture's risk and responsibility for the merchandise ended at this point.

40.     Under FOB Incoterms, GOF assumed all risk and responsibility for the merchandise after Global Furniture delivered it to the importing vessel. This meant that GOF was responsible for all the customs formalities for the import of merchandise into the United States. GOF was responsible for declaring the value of the merchandise imported and paying the associated duties, taxes, and other charges upon importation. GOF contracted with customs brokers to act as GOF's agents and manage the process of importing merchandise into the United States, including filing entry summaries and supporting documents.

41.     Smith controlled all aspects of GOF's business with Global Furniture. He was the final authority on all issues regarding merchandise purchased from Global Furniture and was aware of the orders, invoices, pricing, and payments.

**B. Defendants Develop Fraudulent Scheme to Avoid Tariffs and Underpay Customs Duties**

42.     Section 301 of the Trade Act of 1974, authorizes the United States Trade Representative ("USTR") to investigate and take action to enforce the United States' rights under trade agreements and respond to certain foreign trade practices. These actions include imposing tariffs, often referred to as "Section 301" tariffs. *See* 19 U.S.C. §§ 2411–2420.

43.     Generally, Chapter 9401 HTSUS codes have not been subject to any tariffs or duties, including the codes for office chairs and related parts.

44.     In September 2018, the USTR imposed a 10% Section 301 tariff on an assortment of imported merchandise from the PRC, including office chairs and related parts. *See* 83 Fed. Reg. 47,974 (Sept. 21, 2018); 83 Fed. Reg. 49,153 (Sept. 28, 2018).

45.     On May 10, 2019, the USTR increased the rate of Section 301 tariffs from 10% to 25% with respect to the same assortment of imported merchandise from the PRC. *See* 84 Fed. Reg. 20,459 (May 9, 2019).

46.     During the relevant time period, all of GOF's imports from Global Furniture were subject to the USTR's Section 301 tariffs.[1] In other words, GOF only imported merchandise from Global Furniture that required payment of a 25% tariff.

---

[1] 9401.30.8030 (swivel seats with variable height adjustment); 9401.39.0030 (swivel seats with variable height adjustment); 9401.71.0031 (other seats, with metal frames, upholstered); 9401.90.5081 (seat parts).

9

47.     Since GOF was responsible for paying all customs duties on imported merchandise, the 25% tariff on merchandise imported from the PRC cut directly into GOF's profits.

48.     Typically, to protect their profits, businesses attempt to pass along the increased cost of tariffs to purchasers in the form of higher prices.

49.     This is what Smith attempted to do initially. Around the summer of 2019, Smith started asking Amazon for approval to increase the prices on GOF's imported office chairs.

50.     In August 2019, Smith sent an email to Amazon proposing increased sales prices "directly due to the increase in the US tariffs." Smith told Amazon that GOF "[r]eally need[s] your help to offset our increasing tariffs. We are now upside down on a few ASIN's[2] financially due to the higher tariffs we are paying."

51.     Amazon only allowed a smaller than requested price increase on most of the different types of office chairs, denying Smith's efforts to offset the increased tariffs by increasing prices across the board, thus cutting into GOF's profitability.

52.     Having been unable to raise prices, Defendants decided to maintain profitability by working with Global Furniture to fraudulently underpay customs duties owed to the United States by making false representations about the value of the imported office chairs in entry summaries.

53.     Soon after the May 2019 increase in tariffs, Defendants and Global Furniture started a double invoicing scheme. Defendants coordinated with Global Furniture to create two invoices and supporting documents for every fraudulent transaction. One invoice and its supporting documents were genuine, reflecting the price GOF paid Global Furniture for the imported office

---

[2] ASIN stands for Amazon Standard Identification Number and is a product code used to identify specific Amazon products. *See* Mickey Toogood, *Understanding ASINs: Your guide to Amazon's product identification system* (June 4, 2025), https://sell.amazon.com/blog/what-is-an-asin.

chairs ("real invoice"). GOF did not submit this real invoice to CBP or the customs broker that filed entry summaries on GOF's behalf.

54.    Defendants then coordinated with Global Furniture to create a second invoice and supporting documents that were largely identical to the real invoice but were altered to show a significantly lower price for imported office chairs than GOF actually paid Global Furniture ("fake invoice").

55.    Defendants made or used these fake invoices, and/or caused customs broker or other agents to use these fake invoices, to report the falsified information to CBP through entry summaries. Defendants knew the information in the fake invoices, and therefore the information reported to CBP, was false.

56.    As a result, GOF declared lowered prices to CBP in order to avoid paying the full amount of tariffs owed.

57.    For example, once Defendants began their fraudulent scheme, they reported substantially lower office chair prices to CBP than the prices reported in the preceding months.

a.    Item number GF-G60044:[3]

| GF-G60044 |  | AmazonBasics Low-Back Task Chair | B00XBC3J84 |

---

[3] GOF occasionally added a "G" to the item number in its commercial documents (e.g., GF-60044 and GF-G60044 refer to the same office chair model).

GOF reported unit prices of $26.26 to CBP from January through April 2019. After implementing the fraudulent scheme, GOF started claiming lower unit prices of $10.20 in purchase orders as early as May 2019.

b. Item number GF-9390M-1:

| | | | |
|---|---|---|---|
| GF-9390M-1 | | AmazonBasics Mid-Back Office Chair, Brown | B0735WMNT5 |

GOF reported unit prices of $32.43 to CBP from January through May 2019. After implementing the fraudulent scheme, GOF started claiming lower unit prices of $12.34 in purchase orders as early as June 2019.

c. Item number GF-80293H:

| | | | |
|---|---|---|---|
| GF-80293H | | High-Back Executive Chair - Black | B00XBC3BF0 |

GOF reported unit prices of $51.35 to CBP from January through March 2019. After implementing the fraudulent scheme, GOF started claiming lower unit prices of $19.34 as early as August 2019.

58.   Defendants started reporting these significantly decreased unit prices at the same time they were complaining to Amazon about the higher tariffs harming their profit margin.

59.   GOF employees began noticing that the prices listed on GOF's purchase orders were dropping when GOF should have been paying more in customs duties due to the increased

tariffs. GOF employees also noticed that the purchase order prices did not always match the commercial invoices received from Global Furniture. When questioned about these discrepancies, Smith said it was not an issue because he had a deal in place with Global Furniture.

60.     Defendants did not advise their customs brokers and other agents that the fake invoices contained false information. In fact, as discussed in more detail below, Defendants, in coordination with Global Furniture, directed customs brokers and other agents to use the fake invoices in instances where these agents questioned the information being reporting to CBP.

61.     As agents of GOF, the customs brokers incorrectly declared that the information in the entry summaries were "true and correct." GOF remained ultimately responsible for the accuracy of all information reported to CBP as the importer of record.

62.     Defendants' submission, and/or actions to cause the submission, of these fake invoices to CBP and corresponding false representations as to the value of the imported merchandise was material to CBP's determination of the amount of customs duties owed. As a result, GOF submitted false claims over hundreds of importations during the relevant time period. GOF evaded at least $2 million in customs duties.

**C. Examples of Defendants' Fraudulent Scheme**

63.     The following provides specific examples that illustrate Defendants' fraudulent scheme. These examples are representative of the hundreds of importations and fraudulent entry summaries that Defendants submitted to customs brokers and CBP during the relevant time period.

**a. Exhibit 1: Defendants File Falsified Entry Summary Supported by Fake Purchase Order and Commercial Invoice**

64.     GOF purchased 1,320 office chairs from Global Furniture in June 2019. GOF submitted a purchase order to Global Furniture dated June 17, 2019, listing a $29.69 unit price for a total price of $39,190.80. Ex. 1-A (real purchase order). Global Furniture confirmed the purchase

with a pro forma invoice numbered MA2308-16-ER4 and dated June 20, 2019, listing a final $31.48 unit price for a total price of $41,553.60. Ex. 1-B (real pro forma invoice).

65. Defendants created, or caused Global Furniture to create, a fake commercial invoice dated July 12, 2019, for invoice number MA-2308-16-ER4. This fake commercial invoice is for 1,320 units of the same office chairs as the real purchase order, but it lists a lower unit price of $12.34 for a total price of $16,288.80. Ex. 1-C (fake commercial invoice).

66. To further obscure the fraudulent scheme, Defendants also created a fake purchase order dated June 12, 2019. This fake purchase order is for 1,320 units of the same office chairs as the real purchase order, but GOF used the same lower unit price of $12.34 and lower total price of $16,288.80 as the fake commercial invoice.[4] Ex. 1-D (fake purchase order).

67. On September 4, 2019, GOF filed an entry summary through its customs broker JAS Forwarding Inc. that reflected the import of office chairs for invoice number MA-2308-16-ER4. This entry summary attached the fake commercial invoice, so GOF fraudulently declared the lower $12.34 unit price for a total price of $16,288.80. Ex. 1-E. The price GOF declared to CBP undervalued the office chairs by over 150%.

68. The higher-priced real purchase order and pro forma invoice reflected GOF's actual purchase of office chairs from Global Furniture, while the lower-priced fake commercial invoice and purchase order were created for submission to CBP and to obscure Defendants' fraudulent scheme.

---

[4] The fake purchase order correctly lists 1,320 units in the line-item entry, but incorrectly lists 1,372 units in "Total PCS" box of the form.

69.     By declaring the fraudulently lowered amount of $16,288.80 as the value of the office chairs, GOF paid only $4,072.25 in duties. GOF should have paid approximately $10,000 in duties if the real value of the office chairs was declared.

    **b.  Exhibit 2: Defendants File Falsified Entry Summary Supported by Fake Purchase Order and Commercial Invoice**

70.     GOF purchased 8,874 office chairs from Global Furniture in October 2019. GOF submitted a purchase order for 9,100 office chairs to Global Furniture dated October 23, 2019, listing unit prices ranging from $21.99 to $51.15 for total price of $308,799.00. Ex. 2-A (real purchase order). Global Furniture confirmed the purchase for a lower number of 8,874 office chairs with a pro forma invoice numbered MZ2348-US-1910280031-E and dated October 28, 2019, listing the same range of unit prices for a total price of $301,236.69. Ex. 2-B (real pro forma invoice).

71.     Defendants created, or caused Global Furniture to create, a fake commercial invoice dated November 25, 2019, for invoice number MZ2348-US-1910280031-E. This fake commercial invoice is for 8,874 units of the same office chairs as the real pro forma invoice, but it lists lower unit prices ranging from $9.14 to $21.07 for a total price of $124,768.30. Ex. 2-C (fake commercial invoice).

72.     To further obscure the fraudulent scheme, Defendants created a fake purchase order dated October 23, 2019. This fake purchase order is for 8,874 units of the same office chairs as the real pro forma invoice, but GOF lists the same lower unit price range and lower total price of $124,768.30 as the fake commercial invoice. Ex. 2-D (fake purchase order).

73.     On January 17, 2020, GOF filed an entry summary through its customs broker JAS Forwarding Inc. that reflected the import of office chairs for invoice number MZ2348-US-1910280031-E. This entry summary attached the fake commercial invoice, so GOF fraudulently

declared the lower unit prices ranging from \$9.14 to \$21.07 for a total price of \$124,768.30. Ex. 2-E. The price GOF declared to CBP undervalued the office chairs by over 140%.

74.     The higher-priced real purchase order and pro forma invoice reflected GOF's actual purchase of office chairs from Global Furniture, while the lower-priced fake commercial invoice and purchase order were created for submission to CBP and to obscure Defendants' fraudulent scheme.

75.     By declaring the fraudulently lowered amount of \$124,768.30 as the value of the office chairs, GOF paid only \$31,192 in duties. GOF should have paid over \$75,000 in duties if the real value of the office chairs was declared.

**D.  Defendants' Efforts to Conceal Fraudulent Scheme and Evade Detection**

76.     The United States served GOF with a Civil Investigative Demand ("CID") on November 19, 2020, requiring GOF to produce documents and answer interrogatories regarding GOF's importation of office chairs from Global Furniture. On December 2, 2020, the United States also notified Defendants' counsel of the existence of a parallel criminal investigation. In response, Defendants engaged in further efforts to conceal their fraudulent scheme to underpay customs duties.

77.     Shortly after receiving the CID, Smith directed GOF employees to delete emails and documents related to pricing and GOF's business with Amazon.

78.     Smith checked employees' desks to make sure they did not keep any information regarding GOF's pricing. On at least one occasion, Smith logged into an employee's computer to gather and delete information in the employee's files relating to Amazon pricing.

79.     On December 14, 2020, Smith directed GOF's information technology company, Creative Consultants Group, to implement a new policy to delete any emails older than sixty days.

This policy applied both prospectively and retrospectively, meaning that all emails older than sixty days were deleted at the time of implementation. This new email retention policy was ultimately rescinded, but not before it resulted in the mass deletion of emails related to Defendants' fraudulent scheme.

80.    GOF transferred its information technology business to Waccamaw Telecommunications Service in early 2021. On October 7, 2021, Smith ordered Waccamaw Telecommunications Service to delete all of GOF's emails from all employees and delete the "back-up server," too.

81.    GOF employees complained to Smith that the deletion of emails harmed GOF's ability to conduct business, as it deleted historical documentation and communications containing information on pricing and ongoing relationships with purchasing customers.

82.    Smith's efforts to destroy documents and communications related to GOF's business with Global Furniture not only ran counter to common business practices, it also violated GOF's record retention obligations under customs laws and regulations, *see supra* ¶ 23, as well as GOF's obligation to preserve materials relevant to the government investigations.

83.    In addition to destroying documents and communications, Defendants fabricated business documents in an effort to conceal Defendants' fraudulent scheme. Defendants coordinated with Global Furniture to create fake invoices and supporting documents for submission to CBP, and GOF submitted these fake documents in response to the CID. After receiving the CID, Smith also personally directed GOF employees to create fake invoices and documents related to imports from Global Furniture on at least one occasion.

**E.  Defendants' Fraudulent Scheme Continued During Government Investigation**

84.     While they were trying to cover up their previous fraudulent activity, Defendants continued to operate their fraudulent scheme to underpay customs duties.

### a. Exhibit 3: Defendants File Falsified Entry Summary Supported by Fake Commercial Invoice

85.     On August 9, 2021, a representative of International Brokerage Services, Inc., GOF's customs broker, sent an email to a GOF finance specialist with two attachments, one titled "MZ2348-US-2009180068-E1 Invoice" and one titled "MZ2348-US-2009-180068-E1 #Packing list." Ex. 3-A.

86.     Despite the titles of the attachments, International Brokerage Services was in possession of two nearly identical commercial invoices for the same 1,440 office chairs GOF purchased from Global Furniture. Both commercial invoices were dated June 25, 2021, both bore the same invoice number, and both were affixed with Global Furniture's seal. *Id.*

87.     The one key difference between the two commercial invoices was unit price. The real commercial invoice listed unit prices ranging from $20.12 to $55.24 per office chair for a total purchase price of $59,878.72. The fake commercial invoice listed significantly lower unit prices ranging from $7 to $16.55 for a total purchase price of $17,127.15. *Id.*

88.     The International Brokerage Services representative asked GOF which invoice should be used to complete the entry summary. GOF's finance specialist forwarded this email to GOF's finance manager, and both employees approached Smith for instruction on how to proceed. Smith directed them to tell International Brokerage Services to use the lower-priced fake commercial invoice. On August 10, 2021, GOF's finance manager responded to International Brokerage Services and relayed Smith's instruction to use the lower-priced fake commercial invoice. Ex. 3-B.

89.     On August 23, 2021, GOF filed an entry summary through its customs broker International Brokerage Services that reflected the import of office chairs for invoice number MZ2348-US-2009-180068-E1. This entry summary attached the fake commercial invoice, so GOF fraudulently declared the lower unit prices for a total price of $17,127. Ex. 3-C. The price GOF declared to CBP undervalued the office chairs by approximately 250%.

90.     The higher-priced real commercial invoice reflected GOF's actual purchase of office chairs from Global Furniture, while the lower-priced fake commercial invoice was created for submission to CBP and to obscure Defendants' fraudulent scheme.

91.     By declaring the fraudulently lowered amount of $17,127.15 as the value of the office chairs, GOF paid only $4,281.75 in duties. GOF should have paid approximately $15,000 in duties if the real value of the office chairs was declared.

**b. Exhibit 4: Defendants File Falsified Entry Summary Supported by Fake Commercial Invoice**

92.     On March 18, 2021, a representative of O.T.S. Astracon, GOF's freight forwarder, sent an email to Smith and an employee of Global Furniture. The email contained two attachments for invoice number MZ2348-US-2009030059-E, one titled invoice and the other titled packing list. Ex. 4-A.

93.     Despite the titles of the attachments, O.T.S. Astracon was in possession of two nearly identical commercial invoices for the same 1,839 office chairs GOF purchased from Global Furniture. Both commercial invoices were dated February 23, 2021, both bore the same invoice number, and both were affixed with Global Furniture's seal. *Id.*

94.     The one key difference between the two commercial invoices was unit price. The real commercial invoice listed unit prices ranging from $26.38 to $32 per office chair for a total

purchase price of $55,931.22. The fake commercial invoice listed an $8.5 unit price for all office chairs for a total purchase price of $15,631.50. *Id.*

95.     The O.T.S. Astracon representative asked which invoice should be used to complete the entry summary. Global Furniture's employee claimed the wrong invoice was attached and directed O.T.S. Astracon to use the lower-priced fake invoice. Ex. 4-B.

96.     On April 6, 2021, GOF filed an entry summary through its customs broker International Brokerage Services that reflected the import of office chairs for invoice number MZ2348-US-2009030059-E. This entry summary attached the fake commercial invoice, so GOF fraudulently declared the lower unit price of $8.5 dollars for a total price of $15,631.50. Ex. 4-C. The price GOF declared to CBP undervalued the office chairs by over 250%.

97.     The higher-priced real commercial invoice reflected GOF's actual purchase of office chairs from Global Furniture, while the lower-priced fake commercial invoice was created for submission to CBP and to obscure Defendants' fraudulent scheme.

98.     By declaring the fraudulently lowered amount of $15,631.50 as the value of the office chairs, GOF paid only $3,908 in duties. GOF should have paid approximately $14,000 in duties if the real value of the office chairs was declared.

### F. Damage to United States by Defendants' Fraudulent Scheme

99.     As discussed above, the only merchandise GOF imported from Global Furniture during the relevant time period was office chairs and related parts imported from the PRC. All payments GOF made to Global Furniture were for this imported merchandise.

100.    Defendants operated a fraudulent scheme to undervalue all entries of merchandise imported from Global Furniture during the relevant time period. GOF fraudulently declared a total

import value for the office chairs that was millions of dollars less than the amount GOF actually paid Global Furniture for the office chairs.

101.    As a result, Defendants underpaid at least $2 million dollars in customs duties owed to the United States.

## FIRST CLAIM
(Against all Defendants)
31 U.S.C. § 3729(a)(1)(G)
Conceals or Improperly Avoids or Decreases Obligation to Pay Money to the Government
("Reverse False Claims")

102.    The United States repeats and realleges the allegations contained in paragraphs 1 through 101 as if fully set forth herein.

103.    During the relevant time period, Defendants knowingly concealed or improperly avoided or decreased an obligation to pay or transmit money to the United States.

104.    Defendants concealed, avoided, or decreased an obligation to pay customs duties to the United States with actual knowledge of the obligation to pay customs duties to the United States, or with reckless disregard or deliberate ignorance of the obligation.

105.    Defendants' falsified entry summaries and supporting documents were material to CBP's determination of the amount of customs duties owed. Had CBP known the statements on the entry summaries regarding value were false and the supporting invoices were fraudulent, CBP would not have permitted entry into the United States without full payment of duties owed.

106.    By virtue of the concealment and knowing avoidance and decrease of an obligation to pay or transmit money to the United States, the United States suffered damages and is entitled to damages in an amount to be determined at trial, plus civil penalties for each violation.

**SECOND CLAIM**
(Against all Defendants)
31 U.S.C. § 3729(a)(1)(G)
Making, Using, or Causing to be Made or Used, False Records or Statements
Material to an Obligation to Pay Money to the Government

107.     The United States repeats and realleges the allegations contained in paragraphs 1 through 101 as if fully set forth herein.

108.     During the relevant time period, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States.

109.     These false records and statements included, but were not limited to, false statements on entry summaries, fake invoices, and other underlying supporting documents required by CBP to support values reported and duties owed.

110.     Defendants made or used, or caused to be made or used, such false records or statements with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

111.     Defendants' falsified entry summaries and supporting documents were material to CBP's determination of the amount of customs duties owed. Had CBP known the statements on the entry summaries regarding value were false and the supporting invoices were fraudulent, CBP would not have permitted entry into the United States without full payment of duties owed.

112.     By virtue of causing to be presented the false statements on the entry summaries and false records material to an obligation to pay money to the United States, the United States suffered damages and is entitled to damages in an amount to be determined at trial, plus civil penalties for each violation.

### THIRD CLAIM
(Against all Defendants)
Unjust Enrichment

113.    The United States repeats and realleges the allegations contained in paragraphs 1 through 101 as if fully set forth herein.

114.    This is a claim for the recovery of monies by which Defendants have been unjustly enriched during the relevant time period at the expense of the United States.

115.    During the relevant time period, Defendants submitted false records and/or false statements regarding the value of the imported merchandise and the customs duties owed, thereby Defendants avoided paying the full amount of customs duties owed to the United States and were unjustly enriched in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, the United States prays for judgment against all Defendants as follows:

A.    On the First and Second Claims (False Claims Act), for treble damages sustained by the United States, together with maximum civil penalties under the FCA and post-judgment interest;

B.    On the Third Claim (Unjust Enrichment) for the amount by which the Defendants were unjustly enriched by evading proper duties at the expense of the United States; and

C.    Such other relief as the Court deems just and proper.

### JURY DEMAND

The United States requests a trial by jury pursuant to Federal Rule of Civil Procedure 38.

*[signatures on following page]*

Respectfully submitted,

BRYAN P. STIRLING
UNITED STATES ATTORNEY


s/ Austin E. McCullough
Austin E. McCullough (#14050)
James C. Leventis, Jr. (#9406)
Assistant United States Attorneys
151 Meeting Street, Suite 200
Charleston, SC 29401
Telephone (843) 266-1609
Email: Austin.mccullough@usdoj.gov

*Attorneys for the United States of America*

July 15, 2025